## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 19-** |
| **v.** | : | **DATE FILED:** |
| **CHARLES F. KOHLERMAN, IV** | : | **VIOLATIONS:** |
| | | **18 U.S.C. § 1349 (conspiracy to commit wire** |
| | : | **fraud – 1 count)** |
| | | **21 U.S.C. § 841(a)(1), (b)(1)(C) (distribution** |
| | : | **and dispensing of controlled substances – 14** |
| | | **counts)** |
| | : | **Notice of forfeiture** |

### INFORMATION

### COUNT ONE

THE UNITED STATES ATTORNEY CHARGES THAT:

At all times material to this Information:

1.     A pharmacy, referred to as "Pharmacy 1," was a corporation organized under the laws of the Commonwealth of Pennsylvania and a licensed pharmacy doing business in the Eastern District of Pennsylvania.

2.     Defendant CHARLES F. KOHLERMAN, IV was a licensed pharmacist in the Commonwealth of Pennsylvania, a resident of the Eastern District of Pennsylvania, and owner and operator of Pharmacy 1.

3.     Individual 1, who is known to the United States Attorney, was a licensed pharmacist in the Commonwealth of Pennsylvania, a resident of the Eastern District of Pennsylvania, and an employee at Pharmacy 1.

4.     A pharmaceutical manufacturer, referred to as "Manufacturer 1" was based in New York City.

1

5.     Lipitor® was Manufacturer 1's brand-name cholesterol drug for the drug atorvastatin calcium.

6.     Following the expiration of Manufacturer 1's patent on atorvastatin calcium in November 2011, generic formulations of the drug were marketed at significantly lower prices than Lipitor®.

7.     The Lipitor Savings Card was offered by Manufacturer 1 to incentivize pharmacies to dispense brand-name Lipitor® over its generic drug counterparts by covering all or a portion of the cost of the brand-name Lipitor® that was not covered by a patient's private insurance.

8.     A generic pharmaceutical manufacturer, referred to as "Manufacturer 2," was a wholly owned subsidiary of Manufacturer 1 and was based in New Jersey.

9.     Manufacturer 2 manufactured atorvastatin calcium, the authorized generic version of Lipitor®.

10.     A payment processor corporation, referred to as "Company 3," was based in Kansas City, Missouri.

11.     A payment processor corporation, referred to as "Company 4," was based in Morrisville, North Carolina.

### THE CONSPIRACY AND SCHEME TO DEFRAUD

12.     From at least in or about March 2015 until in or about November 2018, in the Eastern District of Pennsylvania, and elsewhere, defendant

### CHARLES F. KOHLERMAN, IV

willfully, that is, with the intent to further the object of the conspiracy, and knowingly, conspired and agreed with Individual 1, and others, known and unknown to the United States Attorney, to

2

devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## OBJECT OF THE CONSPIRACY

13.     It was a part and object of the conspiracy that defendant CHARLES F. KOHLERMAN, IV, Individual 1, and others, known and unknown to the United States Attorney, sought to defraud Manufacturer 1 of approximately $4,562,834.97 by submitting false and fraudulent claims for Lipitor® reimbursements to Manufacturer 1.

## MANNER AND MEANS

It was a further part of the conspiracy that:

14.     Defendant CHARLES F. KOHLERMAN, IV, Individual 1, and others, known and unknown to the United States Attorney, purchased limited stock of Lipitor® from Manufacturer 1 and carried limited stock of Lipitor® at Pharmacy 1.

15.     Defendant CHARLES F. KOHLERMAN, IV, Individual 1, and others, known and unknown to the United States Attorney, purchased significant quantities of cheaper generic atorvastatin calcium from Manufacturer 2 and carried significant stock of generic atorvastatin calcium at Pharmacy 1.

16.     Defendant CHARLES F. KOHLERMAN, IV, enrolled Pharmacy 1 customers, with or without their knowledge and consent, in the Lipitor Savings Card Program.

3

17.     Regardless of whether a customer's prescription called for brand-name Lipitor® or permitted generic substitution, defendant CHARLES F. KOHLERMAN, IV, Individual 1, and others known and unknown to the United States Attorney, filled prescription bottles with cheaper, generic atorvastatin calcium, labeled those prescription bottles as brand-name Lipitor®, provided the falsely-labeled prescription bottles to patients, and submitted false and fraudulent claims for reimbursement to Manufacturer 1 based on Pharmacy 1's purported disbursement of Manufacturer 1's Lipitor®.

18.     In order to initiate the claims submission process, defendant CHARLES F. KOHLERMAN, IV, Individual 1, and others, known and unknown to the United States Attorney, operating under the direction of the defendant, transmitted from Malvern, Pennsylvania to Kansas City, Missouri, by means of wire communication in interstate commerce, electronic transmissions of claims for payment to Company 3 for Lipitor®, and transmitted from Malvern, Pennsylvania to Morrisville, North Carolina, by means of wire communication in interstate commerce, electronic transmissions of claims for payment to Company 4 for Lipitor®.

19.     Defendant CHARLES F. KOHLERMAN, IV and others did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, false and fraudulent claims for reimbursement to Manufacturer 1 of approximately $4,562,834.97. As a part of this scheme, defendant KOHLERMAN, IV was reimbursed approximately $1,696,566.22.

All in violation of Title 18, United States Code, Section 1349.

4

## COUNTS TWO-FIFTEEN

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

At all times material to the Information:

1.    Paragraphs One and Two of Count One are incorporated here.

2.    Individual 2, who is known to the United States Attorney, was a resident of the Eastern District of Pennsylvania.

3.    The Controlled Substances Act governed the manufacture, distribution, and dispensing of controlled substances in the United States.  Under the Controlled Substances Act, there were five schedules of controlled substances – Schedules I, II, III, IV, and V. Controlled substances were scheduled into these levels based upon their potential for abuse or dependence, among other things.  Schedule I contained the most dangerous drugs that have the highest potential for abuse or dependence, and Schedule V contained the least dangerous controlled substances.  Abuse of Schedule II controlled substances could lead to severe psychological or physical dependence.

4.    Oxycodone was a narcotic analgesic that was similar to morphine and was classified as a Schedule II controlled substance, sometimes prescribed under the brand name OxyContin.  Oxycodone was used to treat severe pain, and, even if taken only in prescribed amounts, could cause physical and psychological dependence when taken for a long time. Oxycodone was used in pain relief drugs in varying strengths, including 5, 10, 30, 40, 60, and 80 milligram amounts.  Even if taken only in prescribed amounts, pills containing amounts as low as 5 milligrams of oxycodone could cause physical and psychological dependence when taken for a prolonged time.

5.    Title 21, United States Code, Section 802(10), provided that the term "dispense" meant "to deliver a controlled substance to an ultimate user . . . by, or pursuant to the

lawful order of, a practitioner, including the prescribing and administering of a controlled

substance and the packaging, labeling or compounding necessary to prepare the substance for

such delivery."

6.     Title 21, United States Code, Section 802(11), provided that the term

"distribute" means to deliver (other than by administering or dispensing) a controlled substance.

7.     Title 21, United States Code, Section 821, provided that "[t]he Attorney

General [of the United States] is authorized to promulgate rules and regulations . . . relating to

the registration and control of the manufacture, distribution, and dispensing of controlled

substances. . . ." The Attorney General of the United States has exercised his rulemaking

authority regarding the dispensing of controlled substances through the promulgation of Title 21,

Code of Federal Regulations, Section 1306.04, governing the issuance of prescriptions, which

provides, among other things, that a prescription for a controlled substance to be effective must

be issued for a legitimate medical purpose by an individual practitioner acting in the usual course

of his professional practice.  Moreover, an order purporting to be a prescription issued not in the

usual course of professional treatment is not a prescription within the meaning and intent of

section 309 of the Act [21 U.S.C. § 829] and the person knowingly filling such a purported

prescription, as well as the person issuing it, shall be subject to the penalties provided for

violations of the law relating to controlled substances.

8.     Furthermore, Title 21, Code of Federal Regulations, Section 1306.04(a)

made clear that both the prescribing practitioner and the pharmacist who filled a prescription

bore responsibility in ensuring that prescriptions for controlled substances were issued and filled

for legitimate medical purposes and in the usual course of professional practice: "[t]he

responsibility for the proper prescribing and dispensing of controlled substances is upon the

6

prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."

        9.    The Pennsylvania Code of Professional and Vocational Standards, Title 49, Chapter 27.18, defined the standards of practice for pharmacists and provided in pertinent part: "A pharmacist may not knowingly fill or refill a prescription for a controlled substance . . . if the pharmacist knows or has reason to know it is for use by a person other than the one for whom the prescription was written, or will be otherwise diverted, abused or misused."

        10.    Defendant CHARLES F. KOHLERMAN, IV ignored suspicious activity before filling oxycodone prescriptions in the name of Individual 2, who is known to the United States Attorney. For example, the quantity of narcotics differed from usual medical usage; Individual 2 lived more than 27 miles and over 45 minutes away from Pharmacy 1; Individual 2's prescribing physician practiced a similar distance away from Pharmacy 1; Individual 2 rarely, if ever, picked up his or her own prescriptions in person at Pharmacy 1; and numerous prescriptions were picked up too early based on the thirty-day supplies provided the previous month.

        11.    On or about the dates below, in the Eastern District of Pennsylvania, defendant

### CHARLES F. KOHLERMAN, IV

knowingly and intentionally distributed and dispensed, outside the course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, to Individual 2, with each distribution and dispensing constituting a separate count:

7

| COUNT | APPROXIMATE DATE OF DISTRIBUTION | QUANTITY |
|---|---|---|
| 2 | August 24, 2017 | 120 oxycodone 30 mg. tablets |
| 3 | September 22, 2017 | 120 oxycodone 30 mg. tablets |
| 4 | October 21, 2017 | 120 oxycodone 30 mg. tablets |
| 5 | November 18, 2017 | 120 oxycodone 30 mg. tablets |
| 6 | December 18, 2017 | 120 oxycodone 30 mg. tablets |
| 7 | January 16, 2018 | 120 oxycodone 30 mg. tablets |
| 8 | February 14, 2018 | 120 oxycodone 30 mg. tablets |
| 9 | February 15, 2018 | 120 oxycodone 30 mg. tablets |
| 10 | March 16, 2018 | 120 oxycodone 30 mg. tablets |
| 11 | April 13, 2018 | 120 oxycodone 30 mg. tablets |
| 12 | May 14, 2018 | 120 oxycodone 30 mg. tablets |
| 13 | June 12, 2018 | 120 oxycodone 30 mg. tablets |
| 14 | July 10, 2018 | 120 oxycodone 30 mg. tablets |
| 15 | August 8, 2018 | 120 oxycodone 30 mg. tablets |

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C).

## NOTICE OF FORFEITURE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1.     As a result of the violation of Title 18, United States Code, Section 1349, set forth in this information, defendant

### CHARLES F. KOHLERMAN, IV

shall forfeit to the United States of America any property, real or personal, that constitutes, or is derived from proceeds traceable to the commission of such offense, including, but not limited to, the sum of $1,696,566.22.

2.     If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    (a)     cannot be located upon the exercise of due diligence;

    (b)     has been transferred or sold to, or deposited with, a third party;

    (c)     has been placed beyond the jurisdiction of the Court;

    (d)     has been substantially diminished in value; or

    (e)     has been commingled with other property that cannot be divided without difficulty

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28,

United States Code, Section 2461(c).

for WILLIAM M. MCSWAIN
United States Attorney
Eastern District of Pennsylvania

ROBERT ZINK
Acting Chief
Criminal Division, Fraud Section

10